Thank you, Your Honor, and may it please the Court. Good morning. I'm Jonathan Sternberg, and I represent the appellants, Dr. Jeffrey Weisman and Strategic Biomedical. As Your Honors know, Dr. Weisman brought a number of claims against the defendants, stemming from what he alleged was their destruction of his business that they had persuaded him to relocate to them, after which they harassed him into resigning and then refused to provide him records, which they've still never provided him, to destroy his future prospects. The four claims at issue in this appeal are Count 1, breach of several contracts, Count 2, tortious interference with contracts and business expectancies by the defendant physicians, Count 3, fraudulent inducement in getting Dr. Weisman to resign, and Count 8, civil conspiracy by the defendants. Your Honor's dismissal, respectively, and summary judgment on these claims was error. Your Honor should reverse the District Court's judgment and remand this case for further proceedings. On those counts again, 1, 2, 3, and 8. In deciding these claims as it did, the District Court failed to view the evidence in the case of summary judgment or allegations in the complaint in the case of dismissal, most favorably to Dr. Weisman, and made errors of law. All these claims were proper, and the defendants were not entitled to judgment. Now, in the brief time I have before Your Honors this morning, and to the extent I can, I'd like to walk the Court through and highlight where the District Court went wrong as to these claims. So let's start with Count 1 as to the breach of what we've been calling the Memorandum of Appointment. The crux of this case is that, as the amici point out in their briefs, the Memorandum of Appointment that Dr. Weisman and the defendants signed sets out what are basic requirements for any medical residency program in this country. Among these are, critically, to provide the resident a summative evaluation on his leaving their program so he can transfer elsewhere, and to provide a program free of harassment. And we know that not just because of the amicus briefs, but because the Memorandum of Appointment and its circumstances make this clear. The University and the hospital, so we have Washington University and Barnes Hospital are the two defendants, along with the two individual defendants, Drs. Evers and Benzinger. The University and the hospital participate in a consortium called the GME, or Graduate Medical Education Consortium. Was the MOU here, MOA, something that was created uniquely for these parties, or was it kind of a form that's used generally for residents? It's both, Your Honor. There is a form, but then on top of the form there is a letter of appointment, or a letter of acceptance that is signed by a representative of the consortium and by my client. I know that the defendants have argued that this doesn't count as a contract, it's just some kind of form, but it is a contract. And the district court rejected their contention that it wasn't. The district court solely focused, in this claim, on count one as to the Memorandum of Appointment, solely focused on the notion that the hospital, because we're only dealing with the hospital, the district court dismissed the University from this claim, and we aren't contesting that on appeal. But as to the hospital, that it was impossible for it to perform these two obligations at issue, providing a summative evaluation and providing an atmosphere free of harassment. So, yes, it is a general form, like many contracts are. If you sign up for cable service, they're going to give you a form, but you sign it and it's a contract. So I don't think that's dispositive. Who were the parties to the MOA? So we alleged that it was both Washington University and Barnes Hospital on one side and Dr. Weissman on the other. The district court dismissed Washington University finding it didn't qualify as a party to this, but that the hospital did. So, at least on appeal for our purposes, in the posture of the cases it is now, it's the hospital on one side and Dr. Weissman on the other. So the memorandum of appointment did obligate the hospital, because it's part of this consortium that operates residencies together, to follow the requirements of this national organization which accredits medical residency programs, the ACGME, the Accreditation Council for Graduate Medical Education. And it also obligates them to follow their policies and procedures in their consortium agreement. And these include the ACGME's requirement in its standards that are incorporated here to provide a program that's professional, respectful, and free of mistreatment, abuse, or coercion of students, residents, faculty, and staff. And then both of these expressly require the program, not just the hospital, not just the university, to provide a verification of residency education and a summative evaluation so the resident can transfer if he wishes. And this is important, because without that, you simply can't transfer. And that's an ACGME. What was that referred to? Is that the summation? Is that correct? The summative evaluation is what they call it. And what specifically does the – who has that obligation under the MOA in your view? Both parties – well, any party to it. So again, in our view, at this point, the hospital is the only defendant who's a party to the MOA, at least as the district court found. So the hospital does have that obligation. I thought it referred to Dr. Benzinger. And I apologize if I'm mispronouncing the name. I think that's correct. You read these for months and don't know how to pronounce them. But I thought it referenced him in particular, and I didn't think he worked for Barnes-Jewish. So the ACGME requirement itself doesn't say Dr. Benzinger. It's who is the program director. It says the program director. But more importantly, the MOA says that they have to follow the consortium agreement. And the consortium agreement says that the hospital and the university will cooperate as to all aspects of this, as to all of these requirements. So that's how we get to that. And the district court didn't disagree with that. What the district court found was that the hospital was unable to follow that obligation because it was an obligation of the university. The problem with that, though, is in Missouri, impossibility of performance is an affirmative defense, which I think it is everywhere, which the defendants would have the burden to prove. The defendants never alleged that they couldn't perform that part of the agreement. And the only way that they could show that is if they introduced evidence that their performance was rendered impossible by an act of God, the law, or the other party. To put it into perspective, if I enter into an agreement with one of your honors to sell you a Lamborghini that I'm hoping to get from a friend and I'm unable to get that Lamborghini, that doesn't excuse my performance. And that's kind of what they're alleging here is, well, we're in this agreement, we're in this consortium, but it's really the hospital's responsibility to do that, even though we've agreed to cooperate and ensure all the aspects of this are met. I'm sorry, Your Honor, it looked like you were going to ask me something. And therefore, we couldn't perform this. But that's not what the evidence was here. They didn't introduce any evidence that they even tried to prevent the harassment that Dr. Weissman alleges he suffered and even tried to ensure a summative evaluation was provided. And to this day, Dr. Weissman has still never been provided a summative evaluation. Counsel, now I do have a question. Yes, Your Honor. Who employed Dr. Evers and Dr. Benzinger? Dr. Evers and Dr. Benzinger are employees of Washington University. That's why they're represented by Washington University's counsel here. Okay. And with respect to Barnes-Jewish Hospital, what's wrong with the take on this case and the review of the consortium agreement and the memorandum of appointment and this letter? What's wrong with the take on all this that really Barnes-Jewish Hospital was just sort of, for lack of a better term, a host facility and that really this residency program was operated and managed and run by these doctors who were employed by Washington University? What's wrong with that analysis here? Sure. What's wrong with that analysis is it ignores the substance of the consortium agreement. The consortium agreement states that it provides a governance structure for overseeing the graduate medical education programs by Barnes-Jewish Hospital, these other hospitals, and Washington University School of Law. They agreed to cooperate as to all aspects of this residency program. And the memorandum of appointment, which the hospital is a party to, requires that they obey the policies and procedures of the consortium agreement. So that's what's wrong with that view. But what are the duties? It seems to me that something is lacking here, and that's some specific duties or responsibilities on the part of Barnes-Jewish Hospital. So much of this, the management of residents, for example, is done by these doctors who are employed by Washington University. How do you tie? What are kind of the nuts and bolts responsibilities? Yeah, you can say they're a party to this, but what's the responsibilities on the part of Barnes-Jewish Hospital? Sure. It's more than just being a party. The responsibilities, for example, take the harassment part. It's not just that they can't harass him. It's to ensure an atmosphere free from harassment, to provide one. And even if they're the host, they're the ones providing that. So as part of this, the hospital undertook the obligation to ensure that environment. It undertook the obligation to ensure that all of the GME consortiums and ACGME's requirements were being met. If it wanted to carve itself out from that, it certainly knew how to do that and could have, but it didn't. The memorandum of appointment incorporates both the ACGME's requirements, which are in the record, as well as the consortium agreement, and that's the problem. I'd like to move on to the second part of count two, if the court has no further questions on that first part, which is the breach of what we've called the lab residency contract. Now this, unlike that first part, that was summary judgment, this is dismissal. So now we're focused on the allegations and Dr. Weisman's amended complaint. The district court didn't hold that there wasn't a lab residency contract, it wasn't properly pleaded or something like that. Instead, it solely held that it was, in fact it rejected the defendant's arguments otherwise, it solely held that this was precluded by Missouri's statute of frauds, because the allegation as it was, was that the defendant's promised to train Dr. Weisman for five years, which is longer than one year in the statute. But this was also error. Again, we're looking at dismissal, so we have to take all the allegations and the complaint as true and draw all reasonable inferences from them. Dr. Weisman pleaded several times in document 35, the amended complaint, that he fully performed and completely performed all aspects of this contract. In Missouri, you can't have a statute of frauds defense where there's been this kind of pleading. And we cite two cases where there was a reversal of a dismissal, in like circumstances, Lafont from the Missouri Court of Appeals in 1995 and Irwin from the Missouri Court of Appeals in 1987. So you say it was pled. Was it argued in opposition to the motion to dismiss or not? I thought that focused more on a partnership theory, but correct me if I'm wrong. So in the opposition to the motion to dismiss, Dr. Weisman once again restated that he had fully performed the obligations of the agreement, and then he argued that it didn't fall within the statute of frauds. I appreciate this was not as artfully argued as I did in our brief. If the court were to find it's not preserved, as we explained in our third brief, we would ask the court to exercise its discretion to hear this issue anyway because it is something about what's in the pleadings. It doesn't depend on any additional issues of fact, and the defendants clearly have had a full opportunity to address this in their own briefing. So I know this is on a motion to dismiss, but is there additional evidence in the record about how many years he worked? In other words, whether the contract, taking at face value that it was pled and we're on a motion to dismiss, I thought the record kind of indicated that he worked from like 2016 to 2018. Is that correct and is that relevant? That is correct, but it's not relevant because his obligation was to move his lab to St. Louis, to affiliate it with the defendants, to apply for the residency and be accepted to it. There was nothing in this agreement that obligated. In fact, it was on them to train him for five years and his allegation is they breached this by forcing him out. So he fully performed by moving, is it SBI? That was full performance in your view? That and applying for the residency and doing everything he was personally supposed to under the lab residency. Did you make the full performance argument in the district court? So as I just said to Judge Kobes, I appreciate it's probably not as artfully argued as it could have been in the opposition to the motion to dismiss. He did state or argue in the opposition to the motion to dismiss that he had fully performed and he argued that the statute of frauds didn't apply. I appreciate the connecting language probably isn't enough, but if the court finds it wasn't adequately argued there, as in the Combs case from 2017 that we cite and the Hirani case from 2016, which Judge Smith, you were a part of that, we'd ask the court to hear that issue anyway, just because it's a pure issue of law with no additional factual development and the defendants have had a full opportunity to respond. Very briefly, I'd like to turn to tortious interference. The district court there held that the claim was impermissibly duplicative of Dr. Weissman's breach of contract claims and the economic loss doctrine prohibited it too. What the district court I think failed to appreciate here is this is a claim not against the university, not against the hospital. It is against these doctors individually. And Missouri allows this kind of claim. We cite a case called Gibson from the Missouri Court of Appeals in 1997. And the important thing there is the fifth element of a tortious interference claim with a contract in Missouri is that by the defendant inducing a breach of contract, the plaintiff thereby suffered damages. The district court's rationale kind of makes it impossible to ever have a tortious interference claim in Missouri because it says, well, if the ultimate damages, even if they're by a third party, are the damages from the breach of contract, then the economic loss doctrine prohibits it. That isn't Missouri law. And there's a Western District decision we cite in our third brief. Western District, a federal decision, MIA Financial Enterprises, that holds that a review of Missouri law for this very reason precludes the rationale that the district court had. Same thing with it being duplicative. The district court cites a case called Ingrassia, which is about an insurance contract, and it also doesn't involve a tortious interference claim. But there was a claim against the contracting party itself, not a third party, saying that the contracting party had also, in addition to breaching its contract, committed a tort, their bad faith. And the Eastern District rightly said, you can't have that. But that's not his claim here. The claim is that these physicians tortiously caused the contracting parties to breach their contracts. And Missouri law absolutely allows that. I see I'm running low on time. I'd like to reserve the rest for rebuttal if the court has no questions. I see no questions. Thank you, Your Honor. Mr. Nolan? Good morning, Your Honors. I'm Mike Nolan with the firm Hush Blackwell, and I represent Barnes Jewish Hospital in this case. Judge Smith, with regards to your question, was this a form document or was it specific to Dr. Weissman? It's a form document. Everyone gets the same document. The residents have absolutely no input in the terms of that document. Judge Shepard, as you noted, Barnes Jewish Hospital has a very distinct role here. It has a hospital. Patients come to that hospital. But it does not provide the training that the university does. Very distinct roles. How about the obligation to provide a harassment-free work environment that counsel on the other side referenced? Excellent question. The MOA, the Memorandum of Appointment, does contain a provision that talks about the hospital's anti-harassment policy. But that is only related to harassment based on protected characteristics like race, gender, religion, nationality. It doesn't apply to negative evaluations. It just doesn't. Did anyone at the hospital provide any sort of recommendation? What's that? Did anyone at the hospital provide any sort of recommendation or was obligated to or expected to? Absolutely not. In other words, the Memorandum of Appointment clearly states that the evaluation of residents and the records regarding that fall to the program director who is Dr. Bensinger, who was employed by the university, not the hospital. They have the records. Counsel said that the ACGME guidelines require a summative evaluation. They do. But they specifically say the program director must provide the summative evaluation. It doesn't say the hospital. It doesn't say the GME. Is there some requirement or designation or expectation as to when that is to be produced and to whom it's to be disclosed? Well, so the ACGME guidelines discuss at the completion of the program, the program director is to provide a summative evaluation at the completion of the program. There is another section that talks about transfers prior to that. By definition, that would be summative. It would be at the conclusion and wrap it up, so to speak. But there is language there about when a student wants to transfer. But again, it specifically says the program director, Dr. Bensinger, not the hospital, not the consortium. They're the ones that are doing the evaluation. They're the ones that have the records. The MOA at paragraph 17, again, says the program director will do the evaluations and will keep the evaluation file, and it's confidential. So for counsel to say that the hospital was required to do it is just absolutely baseless. The records are in the possession of the program director. The documents, both the MOA and the ACGME guidelines, specifically say that he is supposed to provide those evaluations or the summative evaluation to other schools. Counsel made reference to the impossibility doctrine. We never pled impossibility. We never argued it, and the court never said, oh, it's impossible for them to do it. What we argued below and what the court ruled on was we didn't agree that the memorandum of appointment was a contract. But we said, even if it is, we didn't breach that contract because his Second Amendment complaint complains about, it says, BJH and Wash U harassed him through these negative evaluations. And yet his- Why wouldn't it be a contract? I mean, why wouldn't the MOA be a contract, given its specification of expectations for both sides? Great question, because there was no bargain for consideration for that contract. Dr. Weissman pled and has argued every step of the way that through the National Resident Matching Program, once he was matched, and he had a contract with the NRMP, that contract says, once you're matched to a program, you have to go there and you have to accept their memorandum of appointment. He was legally obligated under his contract with the NRMP. Once he got there, they hand him a form. He has to accept it. He has to be a part of the program. It doesn't matter what they set the stipend at. It could have been a dollar. It could have been $100, $50,000. He is legally bound to accept that. So there's no bargain for consideration there. It's just a form. All the residents show up on the first day, they get the same form. They're required to accept it. The zipper case is directly on point and very instructive here. In the zipper case, a surgeon tried to argue that a hospital's bylaws were contractual in nature. In the zipper case, the court held that they weren't, because there was no bargain for consideration. The court reasoned that the hospital was legally obligated to promulgate bylaws. Because it was legally obligated to, the bylaws couldn't be consideration. Here, because Dr. Weissman was legally obligated to join the program and accept the memorandum of appointment, his doing so can't be consideration for the memorandum of appointment. The zipper case also reasoned that the surgeon in that case had absolutely no input into the bylaws. He didn't negotiate with them. He didn't have anything to say about them. They were just there. When he got to the hospital, they hand him the bylaws. They were already made. They were already worked out by the hospital. And finally, the zipper case made the point that Missouri has a strong public policy when it comes to medical institutions like hospitals. They have to be given deference and discretion in how they deal with the physicians that practice there. That's their world. Courts should not be standing over their shoulder trying to decide whether or not the hospital treated the resident the way it should. So, to be clear, and I believe counsel has admitted, the harassment that Dr. Weissman is complaining about here has absolutely nothing to do with the types of issues that are covered by the Missouri Human Rights Act and Title VII and other similar employment laws. It has nothing to do with his race, religion, anything like that. It's strictly a matter of he didn't think that his evaluations were fair. And, of course, those evaluations are subjective. Even plaintiff's experts admitted that they could not refute any of the negative evaluations that Dr. Weissman received in the program. And that was after five years of litigation, full-blown discovery, fully briefed at the summary judgment level, when it came to responding to the university's statement of material facts, where they backed up the fairness and the rightness of all those evaluations, Dr. Weissman couldn't refute it at all. He had absolutely no evidence to refute those facts which were established in the record. And because of that, the district court ruled there was no evidence that any of Dr. Weissman's evaluations were false. And he did not appeal that ruling. The whole notion that there were false evaluations is long gone. It's no longer an issue in the case. Mr. Sternberg, your time has expired. Oh, thank you, Your Honor. May it please the Court, Kevin Sullivan here for the defendants of Pele's Washington University, Drs. Alex Evers, Richard Benzinger, and Thomas Cox. I'm also here with my partner, Mark Bremmer. I will be addressing three claims that were dismissed at the threshold by the district court. Breach of the so-called lab residency contract against Wash U and BJH. Tortious interference with contract and business expectancy against Dr. Evers and Benzinger. And three, the fraudulent inducement against Wash U, BJH, and Drs. Evers and Benzinger. It's important to note at the outset that what matters is what Dr. Weissman actually alleged in his complaint. Not what he now claims was alleged in his briefing or in oral argument. So despite counsel's protestations to the contrary, Weissman's sole argument for reversal that he performed the lab residency contract, and this took it out of the statute of frauds, was raised for the first time in this appeal, was not raised below, and thus should not be considered in this appeal. Was it in the pleadings or not? It was pled, Your Honor. It was pled, but it wasn't argued below and further, but he also pled, made allegations that demonstrated that he could not have performed, fully performed the so-called lab residency contract. And what specifically, I mean, what's that argument, if you'll flesh that out? Specifically, so under his theory, there was basically a five-year oral contract. And the university and the hospital agreed to let him into the residency, have this vague research affiliation, and then he was obligated to perform the educational training and research obligations under this. He voluntarily resigned in June 2018, and this is established, it's alleged, and it's both established by the record. He was given the choice, you can stay in the residency program and we'll make sure that you get trained, or if you want to leave, you can leave. The choice is yours. He left after two years. Therefore, he couldn't perform all of his research and educational requirements that he claims are the obligations. Likewise, he voluntarily shut down his lab by the end of 2016 because it was running out of money or it was out of money, and he ended up donating it to the Department of Radiology because he wanted to keep his two researchers who were working for him employed. So he couldn't have performed these research obligations that he claims that he had because he was no longer doing research. And similarly, the complaint is replete with allegations about how the university and Dr. Evers and Benzinger and others found that his performance was completely unsatisfactory and that he had meetings with the program's leadership about this. Furthermore, it is not removed from the statute of frauds because his full performance involved present and future obligations that remained. So he still had to engage in research, meet the educational requirements. They were ongoing obligations that he had to perform, and so he could not have fully performed the agreement. Just pointing out specifically that with respect to the arguments below, this was not argued in any of the extensive briefing. What he did argue is that the statute of frauds did not apply because there was some type of partnership form which the district court properly rejected. And even if Dr. Weissman's new argument is considered, dismissal was still appropriate because the dismissal of the completely uncertain and indefinite lab residency contract was warranted. He's alleged that this in part oral, in part written agreement was amended over time. We don't know how it was amended. We don't know what writings were involved. He alleged that the agreement involved performance of research as part of a research affiliation, but this affiliation was going to be on a case-by-case basis. And under Missouri law, no contract is formed where the obligations are indefinite and uncertain. And that applies here because as pled, the lab residency contract and its obligations were completely unknown. And so the only definite term that he alleges is that it was for five years, and that it was an oral contract which brings it squarely within the statute of frauds. And we've cited numerous Missouri cases holding that oral employment agreements lasting longer than one year are barred by the statute of frauds. Likewise, under Missouri law and as applied by this court, the breach of the so-called lab residency agreement is nothing more than a non-cognizable educational malpractice claim. So the educational malpractice doctrine is where the court is asked to evaluate the soundness of educational decisions, and the courts have found that this is a claim for educational malpractice, which is not recognized under Missouri law. Throughout the complaint, Dr. Wiseman alleged that the lab residency contract was breached by faculty members in evaluating his performance and being critical of him, requiring him to repeat rotations, not collaborating with him on research, and not providing one six-month evaluation. All of these merely raise concerns about the reasonableness of the education and training provided to him. And Dr. Wiseman cannot sue for educational malpractice under Missouri law. Turning to the dismissal of the tortious interference claim, again, Dr. Evers, this dismissal should be affirmed for no fewer than five independently sufficient reasons. First, it's settled law of Missouri that a plaintiff cannot recast a breach of contract claim as a tort, and that the facts underlying the tort must be independent from the contract in order to survive a motion to dismiss. Here, and unlike the Gibson case on which plaintiff relies, there is the allegations with respect to what the breach was and what the contract terms were, and the tortious interference are exactly the same. There is no difference. And plaintiff here merely concludes that Dr. Evers and Benzinger intentionally interfered with his contract and business expectancy by committing, causing, or assisting the breach. But what plaintiff actually cites to in his brief are the 11 pages in the amended complaint that detailed this purported lab residency contract and the breaches. And many of those allegations just say it was BJH or Wash U, or it was the anesthesiology department. They might not even mention Dr. Evers or Benzinger. So plaintiff has not shown any independent or distinct conduct that distinguishes this tortious interference claim from the breach of contract claim. The tortious interference claim is similarly barred by the economic loss doctrine, which prohibits a tort remedy based on disappointed contractual expectations and bars recovery for pure monetary losses where the injury results from the breach of contractual duty. Here, Dr. Weissman must have alleged an injury separate and distinct from the injury caused by the breach of contract. He didn't do that here. He's saying it's the same injury, it's the same exact amount of damages, it's the same type of damages. And so, therefore, the tortious interference claim is barred by the economic loss doctrine. It's further well settled under Missouri law that where the defendants in a tortious interference claim are an officer or agent of a corporation, the officer or agent is the corporation for purposes of tortious interference. So that these officers or agents are not third parties to the contract, and thus the tortious interference claim fails. Here, Dr. Weissman expressly alleged that Drs. Evers and Benzinger acted on behalf of and agents and representatives of the university and the hospital in supervising residents in the program. He further alleged that Dr. Evers and Benzinger acted within the scope of their employment and failed to allege that either Dr. Evers or Dr. Benzinger acted outside of the scope of their employment in doing this. Because they were not third parties to the alleged contracts, the tortious interference claim against them fails as well. Likewise, Dr. Weissman, under the subtle law of Missouri, can't establish the lack of justification element for tortious interference claims. And this is because supervisors, under Missouri law, have a legal right and a legitimate interest in criticizing and commenting on an employee's performance. And this legal right and interest in criticizing an employee's performance is even more important here when you have patient safety and health at stake. Here, Weissman just alleged that Drs. Evers and Benzinger interfered with his contracts and business expectancy by making negative comments to other institutions or evaluating him badly. The supervisor relationship, even when the alleged comments or evaluations are alleged as false, defeats the tortious interference claim. Counsel, is there anything in the record indicating an animus creating the reasons for the negative comments? Is there something in the facts to indicate, or allegations, I should say, at this stage of things? Well, as alleged, I believe Plaintiff came up with a theory that was ultimately through discovery that was proved to be incorrect in that Dr. Evers tried to manufacture bad evaluations of Plaintiff because he was mad because Plaintiff was collaborating with a different department. What the record does establish below is that dozens of physician educators at the university noted that Plaintiff had problems with his performance, with his medical knowledge, with his organization, being prepared, being able to act on your feet. And the summary judgment record established that these were the evaluations and they were reported. Counsel, you're within your rebuttal. Actually, you don't have rebuttal, I'm sorry. It's still early. Go ahead and complete your argument. Sorry, Judge. And then finally, turning quickly to the fraudulent inducement claim, first and very quickly, the district court on summary judgment held that there was no separation contract. It's specifically alleged by Dr. Weissman that that's what he was induced to enter into. So now we have it as a matter of law that there was no separation contract, so he couldn't have been induced into anything. Moreover, any of these statements were predictions of the future, promises to do something in the future, or related to actions and decisions by independent third parties, which cannot be representations supporting a fraud claim under Missouri law. I see my time is over. Thank you, Your Honors. Thank you, Mr. Sullivan. Mr. Sternberg, if you would, would you address the same question, what's in the record as to animus and the rationale for the alleged harassment?  So the claim he's talking about, tortuous interference or fraudulent inducement, one or the other that that goes to, those were disposed of on dismissal. So what matters in the record, again, would be what's in the amended complaint. So here, what Dr. Weissman pleaded was that when he wouldn't give Dr. Evers and his department effectively control over Strategic Biomedical, which was a lucrative biomedical engineering company, the reason he had come to Washington University, they decided to basically ruin his life. That they would force him out of the program by engineering false statements, and I'll get to the falsity of those statements in a moment, because I think that's important to address here, given what counsel just said. And ultimately force him out of the program, and now by refusing to give him his summative evaluations, effectively prohibit him from ever transferring to another residency program for anesthesiology again, which is what happened. The notion that this was all disproven in summary judgment is not correct. So Dr. Weissman discovered that the majority of faculty comments, and there's plenty of these in the record too, that the statements from Dr. Evers and Benzinger, or from Dr. Evers, that he had mistreated patients and done bad things, were actually refuted by plenty of other evaluators whose letters are in the record and who even tried to reach out to other programs for him. And this is the most important thing I want to point the court to. It's a document, so this would be a very long appendix, Volume 9, pages 2228 to 2230, which are affidavits that Washington University submitted to the Federation Credentials Verification Service. Because there are two parts to this. You have to have a summative evaluation, but you also have a verification of the residency, right? That part they did, ultimately, because that was done, I think, pretty automatically. And there it says, specifically, that he was never on probation, disciplined, investigated, or anything else negative. One of them is, were any negative reports for behavioral reasons ever filed by instructors? And they answered no. And that's what came out in discovery. And, of course, we have to view the record most favorably to Dr. Weissman, not to the defendants on these issues. I want to correct, in the very brief time I have, a couple of misstatements by counsel. There was a statement that the summative evaluation only applies once the program has been completed. That's not true. It's page 2728 of the appendix, which is in the ACGME requirements. A program director must provide timely verification of the residency and summative performance evaluations for residents who may leave the program prior to completion. The point is, under the ACGME requirements, that you have to have this in order to transfer programs. And they've prevented him from doing that. Counsel also said that harassment is limited to Title VII or Missouri Human Rights Act sort of things. That's not true either. So while there is a statement about that in the memorandum of appointment, more importantly is what's in the ACGME's requirements, which goes further than that. In fact, they concede that in their brief, that programs must provide a professional, respectful, and civil environment that is free from mistreatment, abuse, or coercion of students, etc. That has nothing to do with, as the amici point out in their briefs, that has nothing to do, obviously, if you discriminate against someone because of their race, it would. But it goes further than that. And here, what Dr. Weissman showed, taking his allegations as true, is that he was harassed. I see I'm out of time. We'd rest the rest on our briefs. We ask the Court to reverse the remand. Thank you, Mr. Sternberg. Thank you, Your Honors. The Court appreciates all counsel's participation and argument before the Court. It's been helpful. It's a full record. We have a lot to study in the matter. And we appreciate your help in providing us the information we need. We'll take the case under advisement and render decision. Thank you.